## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 10-26493-MER |
| CHRISTOPHER BLAIR TETA | ) | |
| LAURA ANNE TETA | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| CHRISTOPHER LYKINS | ) | Adversary No. 10-01706-MER |
| LORI J. WAKNIN | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER BLAIR TETA | ) | |
| | ) | Signed/Docketed |
| Defendant. | ) | June 16, 2011 |

### ORDER

THIS MATTER comes before the Court on the Plaintiffs' *Adversary Complaint* (Docket #1) (the "Complaint"), the Plaintiffs' *Joint Motion for Entry of Default - Failure to Prosecute Pursuant to FED. R. CIV. P. 55(a)* (Docket #6) (the "First Motion for Default"), and the Plaintiffs' *Joint Motion for Default Judgment Pursuant to FED. R. BANKR. P. 7055-1-(b)* (Docket #9) (the "Second Motion for Default").[1]

### JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as it concerns determinations as to the dischargeability of particular debts.

### PROCEDURAL BACKGROUND

On June 30, 2010, Christopher Blair Teta ("Teta") and Laura Anne Teta filed a voluntary petition for Chapter 7 bankruptcy relief. On September 29, 2010, Christopher Lykins ("Lykins") and Lori J. Waknin ("Waknin") (collectively, the "Plaintiffs") filed their Complaint against Teta. As is more fully set forth below, the allegations and claims for relief in the Complaint arise from

---

[1] Although this Court has already entered orders on the First Motion for Default and the Second Motion for Default, this Order serves as the final order regarding both motions and the Complaint. To the extent this Order is inconsistent with either prior order, this Order controls.

the consignment of Waknin's vehicle to Spotlight Motors, LLC ("Spotlight") of which Teta is a part owner, and the subsequent sale of the same vehicle to Lykins. Plaintiffs assert the following claims for relief: 1) Fraudulent Transfer under COLO. REV. STAT. § 38-8-101, *et seq.*; 2) Alter Ego Doctrine under COLO. REV. STAT. § 7-80-107; 3) Member Liability under COLO. REV. STAT. § 7-80-606; 4) Common Law Trustee Doctrine; 5) Violation of Colorado Consumer Protection Act under COLO. REV. STAT. § 6-1-105; 6) Conversion/Civil Theft; 7) Civil Conspiracy as to Civil Theft; 8) Fraud and Fraud by Check; 9) Unjust Enrichment; 10) Nondischargeability under § 523(a)(2)(A); 11) Nondischargeability under § 523(a)(4); and 12) Nondischargeability under § 523(a)(6). Based on these claims, Plaintiffs requested a judgment for the following:

(1)     money damages in an amount sufficient to compensate Plaintiffs fully for their injuries, damages and losses;

(2)     treble damages pursuant to COLO. REV. STAT. §§ 18-4-405 and 6-1-113;

(3)     reasonable attorney fees and costs pursuant to COLO. REV. STAT. §§ 18-4-405 and 6-1-113;

(4)     prejudgment and post-judgment interest as allowed by law;

(5)     an order finding Defendant Christopher Teta's debts to the Plaintiffs are nondischargeable in their entirety; and

(6)     such other relief this Court deems just and appropriate.[2]

Teta failed to file an answer or other responsive pleading. Accordingly, on November 19, 2010, the Plaintiffs filed the First Motion for Default requesting the Court find (a) Teta is in default and (b) order any pre-petition obligations Teta owes to Plaintiffs are non-dischargeble under §§ 523(a)(2)(A), (a)(4), and (a)(6). Teta again failed to file a response. On December 8, 2010, the Court issued an Order on the First Motion for Default directing the Clerk's Entry of Default to enter against Teta. However, the Court declined to enter judgment against Teta absent presentation of evidence sufficient to prove the elements of the claims and the basis for the judgment. The Court gave the Plaintiffs twenty (20) days to provide the Court with sufficient evidence through affidavits or to request an evidentiary hearing.

On December 28, 2010, the Plaintiffs filed the Second Motion for Default, including exhibits and affidavits. Plaintiffs again requested the Court find the debts owed by Teta to the Plaintiffs nondischargeable under § 523(a)(2), (a)(4), and (a)(6). Plaintiffs further requested the Court award treble damages for Teta's violations of COLO. REV. STAT. §§ 6-1-113(2)(III) and/or 18-4-405. On January 18, 2011, this Court entered an Order granting in part, and denying in part, Plaintiffs' Second Motion for Default. Specifically, the Court entered the following Orders:

IT IS ORDERED, the *Joint Motion for Default Judgment Pursuant to Fed. R. Bankr. 7055-1-(b)* filed by Plaintiffs on December 28, 2010 (Docket #9) is GRANTED, in part. Judgment shall enter in favor of Plaintiff Lori J. Waknin and against Defendant Christopher Blair Teta in the amount of $19,436.86. Judgment shall enter in favor of Plaintiff Christopher Lykins and against Defendant Christopher Blair Teta in the amount of $27,805.87. Such judgments are nondischargeable pursuant to 11 U.S.C.

---

[2] Complaint, pp. 14-15.

§ 523(a)(2).  The *Joint Motion for Default Judgment Pursuant to Fed. R. Bankr. 7055-1-(b)* is DENIED as to the remaining requests for relief.

IT IS FURTHER ORDERED, if the Plaintiffs wish to pursue the claims under § 523(a)(4) and (a)(6), along with treble damages, the Plaintiffs shall, on or before February 8, 2011, file a request for an evidentiary hearing with the Court to present evidence on the remaining claims. Defendant is barred from presenting evidence at such a hearing.[3]

## FACTUAL BACKGROUND

At the evidentiary hearing, the Court admitted exhibits into evidence and heard testimony from Waknin, Lykins, Chuck Haberstadt, an investigator with the Colorado Motor Vehicle Dealer Board and Auto Industry Division ("Haberstadt"), John C. Thomas, who was Teta's business partner ("Thomas"), and Daniel T. Ronneberg, who was Waknin's attorney ("Ronneberg").[4]  This evidence  establishes the following facts.

Spotlight Motors, LLC ("Spotlight") was an automobile dealership doing business at 985 South Logan Street in Denver, Colorado.[5]  Teta and Thomas were the only two owners and managers of Spotlight.[6]

On or about July 21, 2009, Waknin and Spotlight entered into an agreement for consignment of Waknin's 2002 Mercedes Benz CLK 430 (the "Vehicle") to Spotlight to be sold (the "Consignment Agreement").[7]  The Consignment Agreement is handwritten, signed by Teta and states, in total:

---

[3]  Order, January 18, 2011 (Docket #10).

[4]  *See Minutes of Proceeding* (Docket #22).  Teta did not enter an appearance or testify at the evidentiary hearing on March 17, 2011.  Teta did file a letter with the Court on March 18, 2011 (Docket #21), asserting he was present in Court on March 17, 2011, and requesting the Court consider the statements in his letter regarding his pre-petition settlement negotiations with the Plaintiffs, efforts undertaken to resolve title issues with the Department of Revenue and his intent regarding the transactions with Lykins and Waknin.  Because Teta failed to respond to the Complaint, First Motion for Default and Second Motion for Default, and failed to enter an appearance in open Court, and was not subject to cross-examination, the Court will not consider the statements in Teta's letter.

[5]  Based on Thomas's deposition testimony, Spotlight began operating on March 17, 2006. See Waknin Exhibit 22, p. 11, ln. 2.  All references to a "deposition" or "deposition testimony" are to Thomas's "Rule 69 and 45 Deposition" taken on August 19, 2010, in connection with the Denver District Court case of *Waknin and Lykins v. Spotlight Motors, Chris Teta, and John Thomas,* Case No. 09 CV 10346.  Although Thomas testified on March 17, 2011, that he did not have an opportunity to review and correct his deposition testimony, the papers attached to the transcript show that Lovelace Court Reporting, Inc. notified Spotlight's attorney, Michael McKinnon, on September 13, 2010, that the deposition transcript was ready for review and signing (Waknin Exhibit 22, p. 79).

[6]  Waknin Exhibit 22, p. 11, ln. 3-17.

[7]  Waknin Exhibit 16 (Consignment Agreement).

Spotlight Motors to consign 2002 M-B CLK430 starting 7/21/09. Ask price $24,995. Seller Fee 10% of selling price t.b.d. by Lori Waknin plus $250 for marketing (non-refundable).[8]

On August 28, 2009, Spotlight and Lykins executed a "Buyer's Order and Invoice" wherein Lykins agreed to pay a total of $21,385.42 for the Vehicle.[9] Lykins tendered to Spotlight a cashier's check dated August 28, 2009, in the amount of $21,382.42.[10] In return, Lykins received a "Dealer's Bill of Sale for a Motor Vehicle" dated August 28, 2009, identifying the dealer's agent as John C. Thomas and the buyer as Christopher Lykins, as well as a "Standard Sales Tax Receipt."[11]

In order to obtain a clean title to the Vehicle, the lien held by Public Service Credit Union needed to be satisfied. On September 21, 2009, Spotlight issued a check payable to Public Service Credit Union in the amount of $15,596.56 to pay off Waknin's loan on the Vehicle.[12] The check was dishonored for insufficient funds.[13]

On October 28, 2009, Glenn M. McColm, of Spotlight, sent a facsimile transmission to the Colorado Department of Motor Vehicles requesting an extension of Lykins' temporary license plate/sticker for the Vehicle.[14] Specifically, McColm stated: "Please get an extension for Mr. Christopher Lykins on his 2002 Mercedes. We apologize for the inconvenience to Mr. Lykins and for the extra work for the Dept. of Motor Vehicles. Spotlight Motors will have the title issue cleared up shortly."[15] Lykins received a motor vehicle tax receipt on November 5, 2009, which listed an expiration date of November 20, 2009.[16] Lykins also received two

---

[8]  Waknin Exhibit 16.

[9]  Lykins Exhibit 1 ("Buyers Order and Invoice" dated August 28, 2009) (same as Waknin Exhibit 17). As part of the sale documents, Lykins also introduced Lykins Exhibit 9 ("Disclosures Required as Part of a Motor Vehicle/Powersports Vehicle Sales Contract" dated August 28, 2009 signed by Thomas and Lykins) and Lykins Exhibit 10 ("Buyers Guide" showing the Vehicle was purchased "As Is - No Warranty").

[10]  Lykins Exhibit 2 (1st Bank "Cashier's Check" dated August 28, 2009).

[11]  Lykins Exhibit 3 ("Dealer's Bill of Sale for a Motor Vehicle" dated August 28, 2009) and Lykins Exhibit 4 ("Standard Sales Tax Receipt").

[12]  Waknin Exhibit 15 (Spotlight check number 3867, dated September 21, 2009, payable to Public Service Credit Union in the amount of $15,596.56, signed by Teta.).

[13]  Waknin testimony (March 17, 2011) and Thomas deposition testimony (August 19, 2010) (Waknin Exhibit 22, p. 24, ln. 22-24). See also Waknin Exhibit 21 (September 2009 Guaranty Bank statement).

[14]  Lykins Exhibit 6 (Spotlight Motors facsimile dated October 28, 2009).

[15]  Lykins Exhibit 6.

[16]  Lykins Exhibit 7 (motor vehicle tax receipt).

Colorado Temporary Registration papers, the first with an expiration date of November 20, 2009[17] and the second with an expiration date of December 23, 2009.[18]

On December 9, 2009, Lykins' attorney, Joseph P. Stengel, wrote a letter to Spotlight informing that entity that Lykins had retained the law firm of Benson & Case, noting Lykins' efforts to obtain title to the Vehicle thus far had been ignored, and demanding immediate delivery of the title pursuant to COLO. REV. STAT. § 42-6-112.[19] [20]  At that time, approximately 103 days had passed since the sale of the Vehicle.  On January 8, 2010, Lykins filed a complaint against Spotlight with the Colorado Department of Revenue, Auto Industry Division, briefly describing the complaint as "Mr. Lykins purchased an automobile for cash and has not received title."[21]

As of the date of the trial in this matter, the Public Service Credit Union lien had not been satisfied and Lykins had not received title to the Vehicle.[22] [23]

In Waknin's affidavit attached to the Second Motion for Default, Waknin requests the Court award her the following damages:

| | | |
|---|---|---|
| (i) | Funds withheld from sale of automobile / dishonored check | $17,631.56 |
| (ii) | Insurance, debt servicing (interest only) on automobile | $  1,805.30 |
| | Sub Total | $19,436.86 |

Plus the following pursuant to COLO. REV. STAT. §§ 6-1-113(2)(III) and/or 18-4-405

---

[17] Lykins Exhibit 23 ("Colorado Temporary Registration" with expiration date of November 20, 2009).

[18] Lykins Exhibit 8 ("Colorado Temporary Registration" with expiration date of December 23, 2009).

[19] COLO. REV. STAT. § 42-6-112 provides:

In order to facilitate initial registration of a vehicle, a dealer of motor vehicles shall have not more than thirty days after the date of sale of such vehicle to deliver or facilitate the delivery of the certificate of title to a purchaser or the holder of a chattel mortgage on such motor vehicle, subject to section 42-6-109.

[20] Lykins Exhibit 13 (letter from Joseph P. Stengel, Jr. to Spotlight Motors, dated December 9, 2009) and Lykins Exhibit 14 (certified mail receipt for letter dated December 9, 2009).

[21] Lykins Exhibit 15.

[22] Lykins testimony (March 17, 2011) and Thomas deposition testimony (August 19, 2010) (Waknin Exhibit 22, p. 32, ln. 16-18).

[23] Testimony was also received reflecting previous instances wherein Spotlight Motors allegedly failed to deliver titles to seven or eight customers after a vehicle purchase.  Thomas testimony (March 17, 2011) and Thomas deposition testimony (August 19, 2010) (Waknin Exhibit 22, p. 49, ln. 16-19).

| (iii) | Treble damages ($19,436.86 x 3) | $58,310.58 |
| (iv) | Interest ($19,436.86 x 480 days at 8%) | $ 2,044.86 |
| (v) | Attorney Fees and Costs up to December 21, 2010 | $19,760.00 |
| | Total | $80,115.44 |

Waknin requests the Court find the $80,115.44 is nondischargeable pursuant to §§ 523(a)(2)(A), (a)(4) and (a)(6).

In Lykins' affidavit attached to the Second Motion for Default, Lykins requests the Court award him the following damages:

| (i) | Certified funds paid for purchase of automobile | $21,382.42 |
| (ii) | Automobile repairs[24] | $ 1,623.45 |
| (iii) | Insured Secured Storage 480 days times $10.00 per day | $ 4,800.00 |
| | Sub Total | $27,805.87 |

Plus the following pursuant to COLO. REV. STAT. §§ 6-1-113(2)(III) and/or 18-4-405

| (iv) | Treble damages ($27,805.87 x 3) | $83,417.61 |
| (v) | Interest ($21,382.42 x 480 days at 8%) | $ 2,966.40 |
| (vi) | Attorney Fees and Costs up to December 21, 2010 | $14,943.14 |
| | Total | $101,327.15 |

Lykins requests the Court find the $101,327.15 is nondischargeable pursuant to §§ 523(a)(2)(A), (a)(4) and (a)(6).

## DISCUSSION

### A.   Should the Corporate Veil of Spotlight Be Pierced?

Before this Court can address the nondischargeability issues under § 523, the Court must first determine whether the corporate veil of Spotlight should be pierced at this time.[25]  For the

---

[24]  Lykins testified he had to obtain certain repairs to the Vehicle on August 29, 2009, totaling $602.06 (Lykins Exhibit 12) and on September 9, 2009, totaling $1,082.05 (Lykins Exhibit 11).

[25]  COLO. REV. STAT. § 7-80-107, provides for the application of corporation case law to set aside limited liability as follows:

(1) In any case in which a party seeks to hold the members of a limited liability company personally responsible for the alleged improper actions of the limited liability company, the court shall apply the case law which interprets the conditions and circumstances under which the corporate veil of a corporation may be pierced under Colorado law.

(2) For purposes of this section, the failure of a limited liability company to observe the formalities or requirements relating to the management of its business and affairs is not in itself a ground for

reasons stated below, the Court finds the Plaintiffs have demonstrated such a finding is appropriate.

As this Court has previously discussed in *First Assured Warranty Corporation*:

Under Colorado law, "[a]n alter-ego relationship exists when the corporation is a 'mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist.' " *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006) (citing *Krystkowiak v. W.O. Brisben Co., Inc.*, 90 P.3d 859, 867 n. 7 (Colo. 2004); *Gude v. City of Lakewood,* 636 P.2d 691, 697 (Colo. 1981)).

In determining whether to disregard the corporate fiction and treat the corporation and shareholder as alter-egos, the Colorado Supreme Court has set forth several factors. . . including whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a "mere shell," (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes. *In re Phillips*, 139 P.3d at 644 (citing *Leonard v. McMorris*, 63 P.3d 323, 330; *Newport Steel Corp. v. Thompson*, 757 F.Supp. 1152, 1156 (D. Colo. 1990)).[26]

As to the first factor, whether the corporation is operated as a distinct business entity, the evidence shows Spotlight was set up as a Colorado limited liability company. Under the second factor, there was no evidence to suggest Spotlight funds and assets were commingled with those of Teta and Thomas. These factors weigh against Plaintiffs' alter ego claim.

Regarding the third and seventh factors (whether adequate corporate records are maintained and whether shareholders disregard legal formalities), the evidence weighs in favor of piercing the corporate veil. In support of the Plaintiffs' alter ego claim, Waknin introduced several documents including: (a) "Spotlight Motors, LLC's Outstanding Debt Breakdown" (the "Breakdown")[27] (b) "Spotlight Motors, LLC Cash Disbursements Journal" for the period of January 1, 2009 through December 31, 2009 (the "Journal"),[28] (c) Spotlight federal tax returns for the year 2008 (the "2008 Tax Return"),[29] (d) Spotlight federal tax returns for the year 2009

---

imposing personal liability on the members for liabilities of the limited liability company.

[26] *In re First Assured Warranty Corporation*, 383 B.R. 502, 527 (Bankr. D. Colo. 2008)

[27] Waknin Exhibit 18.

[28] Waknin Exhibit 18.

[29] Waknin Exhibit 19.

(the "2009 Tax Return"),[30] and (e) Spotlight balance sheets, income statements and Guaranty Bank and Trust Company monthly bank account statements for the year 2009.[31]  These are apparently the only corporate records ever produced by Spotlight, Teta or Thomas to Waknin and Lykins throughout the state court and bankruptcy proceedings.[32]  During his state court deposition, Thomas was asked "Did you bring, 'All board resolutions, minutes, operating agreements, shareholder agreements, and other corporate records of Spotlight Motors, LLC.'?"[33]  Thomas responded, "There was no such thing, board meetings, no."[34]  Additionally, the following exchange took place regarding whether Spotlight had an operating agreement:

Q:     Did you have an operating agreement with your partner?
A:     Operating agreement?
Q:     Did you have an agreement describing how your LLC was going to be operated?
A:     Yeah, we formed an LLC, but it was two guys running a business.
Q:     So, in fact, you didn't have an LLC, you had a partnership, didn't you?
A:     An LLC.
Q:     Right.  But you never went through the formalities of drawing up an operating agreement about how - -
A:     I'm sure we have an operating agreement.
Q:     Where is it, sir?
A:     I guess the answer is, no, I didn't bring it.[35]

No minutes or operating agreement were presented to this Court.  The Court also notes the bare-bones, one-page, handwritten Consignment Agreement is evidence Spotlight lacked corporate formalities and adequate documentation to support its transactions.[36]

Ronneberg testified concerning his efforts to research Spotlight's filings with the Colorado Secretary of State.  He stated he checked these records more than once and his research revealed Spotlight had filed a "registration" for Spotlight Motors, LLC, but there were no other

---

[30]  Waknin Exhibit 20.

[31]  Waknin Exhibit 21.

[32]  Out of the eighteen categories of documents Lykins and Waknin requested of Spotlight by way of a subpoena, Thomas only produced three years of Spotlight tax returns at his deposition.  The documents mentioned above in this Order were produced by Thomas at a later time.  Exhibit 22, p. 22, ln. 18-24.

[33]  Waknin Exhibit 22, p. 18, ln. 22-24.

[34]  Waknin Exhibit 22, p. 18, ln. 25.

[35]  Waknin Exhibit 22, p. 19, ln. 1-16.  Questions by Mr. Ronneberg (attorney for Waknin), Answers by Mr. Thomas (as representative of Spotlight).

[36]  Even Thomas described the Consignment Agreement as "a very nonlegal written kind of scratched consignment agreement."  Waknin Exhibit 22, p. 30, ln. 6-7.

documents attached to the registration of the LLC name.  Specifically, there was no operating agreement filed with the Colorado Secretary of State.  Ronneberg further testified he formally requested a copy of the operating agreement several times during the state court proceedings, but has never received a copy of such document (if one exists).

There was no specific evidence tied to any of the other piercing the veil factors. However, several of the above-mentioned documents were introduced to show that Spotlight had no income or very little income during the relevant time period, that Spotlight repeatedly issued insufficient funds checks, and that Teta and Thomas took distributions or draws rather than paying Lykins and Waknin.

Specifically, the Journal shows cash disbursements from Spotlight to Teta in the amount of $42,475.00 for the time period of January 2009 through August 2009, although one disbursement check was voided ($3,500), one given to an auction ($11,275), and one accounted for a Thomas draw ($1,500), resulting in net disbursements to Teta in the amount of $26,200.00 for January through August 2009.[37]  Similarly, the Journal shows cash disbursements from Spotlight to Thomas in the amount of $45,100 for the time period of January 2009 through August 2009, although two of those disbursements checks appear to be reimbursements for company expenses paid by Thomas ($11,200 and $4,000) and one accounted for a Teta draw ($5,000), resulting in net disbursements to Thomas in the amount of $24,900.00 for that same eight month time period.[38]

Spotlight's 2008 Tax Return shows gross sales of $5,398,246, but ordinary business income of only $5,075 after costs and deductions.[39]  Spotlight's 2009 Tax Return shows gross sales of $1,975,451, and ordinary business loss of -$36,830 (no income) after costs and deductions.[40]

Spotlight's checking account statements show Spotlight had a "beginning balance" on June 1, 2009 (the month before Waknin consigned her Vehicle) of $10,669.42, deposits and miscellaneous credits of $222,997.84, withdrawals and miscellaneous debits of $228,368.51, and an "ending balance" on June 30, 2009 of $5,298.75.[41]  During June 2009, Guaranty Bank sent a "Notice of Non-Sufficient Funds" to Spotlight regarding approximately ten of Spotlight's checks.[42]

---

[37]  Waknin Exhibit 18, p. 2.

[38]  Waknin Exhibit 18, p. 3.

[39]  Waknin Exhibit 19.

[40]  Waknin Exhibit 20.

[41]  Waknin Exhibit 21 (June 2009 statement).

[42]  Waknin Exhibit 21 (June 2009 statement).

Spotlights checking account statements further show Spotlight had a "beginning balance" on July 1, 2009 (the month Waknin consigned her Vehicle) of $5,298.75, deposits and miscellaneous credits of $210,829.20, withdrawals and miscellaneous debits of $210,387.41, and an "ending balance" on July 31, 2009 of $5,740.54.[43]  During July 2009, Guaranty Bank sent a "Notice of Non-Sufficient Funds" to Spotlight regarding approximately eighteen of Spotlight's checks.[44]

On August 1, 2009 (the month Lykins purchased the Vehicle), the checking account statements indicate Spotlight had a "beginning balance" of $5,740.54, deposits and miscellaneous credits of $216,381.27, withdrawals and miscellaneous debits of $218,756.73, and an "ending balance" on August 31, 2009 of $3,365.08.[45]  During August 2009, Guaranty Bank sent a "Notice of Non-Sufficient Funds" to Spotlight regarding approximately thirty-one of Spotlight's checks.[46]

Lastly, Spotlight's checking account statements show Spotlight had a "beginning balance" on September 1, 2009 (the month Teta issued the Spotlight check payable to Public Service Credit Union in the amount of $15,596.56) of $3,365.08, deposits and miscellaneous credits of $220,986.46, withdrawals and miscellaneous debits of $223,885.27, and an "ending balance" on September 30, 2009 of $466.27.[47]  During September 2009, Guaranty Bank sent a "Notice of Non-Sufficient Funds" to Spotlight regarding approximately twenty-six of Spotlight's checks, including the check to pay off Waknin's lien.[48]

Thus, under the factors adopted by this Court in *First Assured*, the Court finds the claims asserted by Lykins and Watkins are valid claims against Teta individually because the corporate veil of Spotlight may be pierced in this case.  In addition to the Court's analysis of the factors identified above, the Court finds "justice requires recognizing the substance of the relationship between the [member] and [limited liability company] over the form because the corporate fiction was 'used to perpetrate a fraud or defeat a rightful claim'" and "an equitable result will be achieved by disregarding the corporate veil."[49]

---

[43]  Waknin Exhibit 21 (July 2009 statement).

[44]  Waknin Exhibit 21 (July 2009 statement).

[45]  Waknin Exhibit 21 (August 2009 statement).

[46]  Waknin Exhibit 21 (August 2009 statement).

[47]  Waknin Exhibit 21 (September 2009 statement).

[48]  Waknin Exhibit 21 (September 2009 statement).  Waknin Exhibit 15 (Spotlight check number 3867, dated September 21, 2009, payable to Public Service Credit Union in the amount of $15,596.56, signed by Teta.).

[49]  *In re First Assured Warranty Corporation*, 383 B.R. 502, 527 (Bankr. D. Colo. 2008), *quoting In re Phillips*, 139 P.3d 639, 644 (Colo. 2006).

However, even if the Court had found the Plaintiffs failed to establish an alter ego claim, Teta's actions amount to tortious acts, and he is not protected by the LLC shield for such acts. Such liability is discussed in *Matter of Hyers* as follows:

> Generally officers and directors of a corporation are not liable for the debts of the corporation, but they are liable to the extent that their participation in the commission of a tortious act results in some harm to a third party and causes them to be liable to a third party. *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir. 1987) (per curiam); *Citronelle-Mobile Gathering v. O'Leary*, 499 F.Supp. 871 (S.D. Ala. 1980). This doctrine does not depend upon the same grounds as piercing the corporate veil, *e.g.*, inadequate capitalization, use of corporate form for fraudulent purposes, or failure to comply with formalities of organization. The officer or director is liable as an actor, not an owner. *L.C.L. Theatres, Inc. v. Columbia Pictures Ind., Inc.*, 619 F.2d 455 (5th Cir. 1980); *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3rd Cir. 1978).[50]

## B.   Have Watkins and Lykins Established Claims under § 523(a)(2)(A)?

In their Complaint, Plaintiffs allege the debts are nondischargeable under § 523(a)(2)(A) "because the debts are for money obtained by false pretenses, false representations and/or actual fraud."[51] Section 523(a)(2)(A) provides an individual debtor may not be discharged from any debt for money or property to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[52] To establish their debts are nondischargeable under § 523(a)(2)(A), Waknin and Lykins must prove the following elements:  (1) Teta or Spotlight made a false representation or material omission; (2) Teta or Spotlight made the representation or omission with the intent to deceive Waknin and Lykins; (3) Waknin and Lykins relied on the representation; (4) Waknin and Lykins' reliance was justifiable; and (5) Teta or Spotlight's representation caused Waknin and

---

[50] *Matter of Hyers*, 70 B.R. 764, 772-773 (Bankr. M.D. Fla. 1987). *See also Hildebrand v. New Vista Homes II, LLC*, 2010 WL 4492356, *5 (Colo. App. November 10, 2010) where the Colorado Court of Appeals explained:

> "Corporate agents are liable for torts of the corporation if they approved of, sanctioned, directed, actively participated in, or cooperated in such conduct." *Colorado Coffee Bean, LLC v. Peaberry Coffee Inc.*, [2010 WL 547633, *16] (Colo. App. 2010). Such an agent may "be held personally liable for his or her individual acts ... even though committed on behalf of the corporation, which is also held liable." *Hoang*, 80 P.3d at 867. "At a minimum, personal liability attaches to a defendant who was directly involved in the conduct through conception or authorization." *Id.* at 868. "Other direct involvement, such as active participation or cooperation, specific direction, or sanction of the conduct, also may be sufficient." *Id.*

[51] Complaint, ¶ 95.

[52] 11 U.S.C. § 523(a)(2)(A).

Lykins to sustain a loss.[53]  The Court must determine whether Waknin and Lykins have each proved the above elements by a preponderance of the evidence.[54]

       *1.*      *Waknin's § 523(a)(2)(A) Claim*

After entering into the Consignment Agreement with Spotlight, Waknin testified she was informed there had been an offer on her Vehicle.  Therefore, she went to the Spotlight office to accept the offer and sign the necessary paperwork.  Waknin acknowledged she did receive some of the funds due to her from Spotlight, what she referred to as the "consignment portion," but did not receive the $15,596.56 to pay off her lien with Public Service Credit Union.  Waknin testified Teta told her he would send the $15,596.56 to Public Service Credit Union.  Based on these representations, Waknin accepted the offer to sell the Vehicle and signed the necessary paperwork.

A week or so later, Waknin received a call from Public Service Credit Union inquiring about her monthly car payment that was due.  She explained she had sold the Vehicle to Spotlight and Spotlight was handling the payoff of the lien.  After another week had gone by, Public Service Credit Union called Waknin again asking about her car payment.  She provided the same explanation and then contacted Teta.  Teta told Waknin he sent the check to Public Service Credit Union, but continued to provide excuses for why such lien had not yet been paid off, including a delay due to the Labor Day holiday or that the payment was "caught up in paperwork" or "lost in the mail."  Waknin testified she again believed Teta that the issue was being taken care of.  A couple weeks later, Waknin received another call from Public Service Credit Union and learned Public Service Credit Union never received any funds from Spotlight or Teta.  Waknin confronted Teta and directed him to stop payment on the check allegedly sent by Spotlight to Public Service Credit Union.  Instead, Waknin offered to stop by Spotlight in person to pick up a new check and deliver it to Public Service Credit Union herself.  Waknin obtained a check issued by Spotlight in the amount of $15,596.56 and provided the check to Public Service Credit Union.  She believed she had thus paid off the lien on the Vehicle, but later learned the check was returned for non-sufficient funds.[55]

Thereafter, Waknin continued to call Teta at Spotlight, but never received a return phone call or satisfactory explanation regarding the funds, and eventually retained a lawyer to pursue the matter.  As of the date of the hearing, the Public Service Credit Union lien on the Vehicle has not been satisfied, and Waknin's credit score has fallen.  She continued to make payments for a

---

[53]  *See Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009); *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996)); and *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437 (1995).

[54]  *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

[55]  Waknin Exhibit 15 (Spotlight check number 3867, dated September 21, 2009, payable to Public Service Credit Union in the amount of $15,596.56, signed by Teta.).  See also Waknin Exhibit 21 (September 2009 Guaranty Bank statement).

period of time, but then stopped, and has received calls from repossession companies and collection agencies.

Based upon this evidence, the Court finds Waknin has established a claim under § 523(a)(2)(A). First, Teta made a false representation by telling Waknin that Spotlight would pay off her lien on the Vehicle by making payment directly to Public Service Credit Union. Second, Teta made the representation with the intent to deceive Waknin, as evidenced by Spotlight's history of bounced checks during this period and Teta's continuing false statements regarding the payoff of the lien. Third, Waknin relied on the representations, as shown by her signing the necessary paperwork to sell the Vehicle. Fourth, Waknins' reliance was justifiable because Spotlight and Teta made representations typical of a car dealership. Finally, Teta's representations caused Waknin to sustain a loss, demonstrated by the failure to pay the lien, damage to Waknin's credit score and Waknin's repeated correspondence with Public Service Credit Union and repossession and collection companies.

The Court finds Waknin has established damages for the funds withheld from the sale of the Vehicle (*i.e.* the amount of the dishonored check and payoff of the lien at Public Service Credit Union), plus insurance and debt servicing after the sale of the Vehicle. Such debt is excepted from Teta's discharge pursuant to § 523(a)(2). The Court will address Waknin's request for treble damages, interest, and attorney fees below.

### 2. Lykins' § 523(a)(2)(A) Claim

Lykins testified he viewed the Vehicle on Spotlight's lot on August 28, 2009, and originally spoke with Thomas. That same date, Lykins test-drove the Vehicle. He obtained a cashier's check at 1st Bank for $21,382.42, tendered the cashier's check to Spotlight to purchase the Vehicle, and drove the Vehicle home. Lykins believed that within sixty days of purchasing the Vehicle he would have title to the Vehicle. When sixty days had passed, Lykins contacted Teta to inquire about the title. According to Lykins, Teta represented there was an issue with the title because the prior owner had signed it incorrectly and that Spotlight was taking care of the issue by obtaining a duplicate title from the State of Colorado, which would take an additional six weeks. Because Lykins' temporary tag had expired, Teta sent Lykins information on how to obtain an extension. Lykins was only able to obtain a short 15-day extension of his temporary tag.

In December 2009, Lykins' second temporary tag expired and Lykins called Teta again. According to Lykins, Teta responded the title was "being held hostage by the previous owner of the vehicle" who did not agree to the amount she was paid.[56] This was the first time Lykins had any indication another owner or person was involved in the transaction because he was not previously told the Vehicle was consigned to Spotlight.

---

[56] Thomas admitted he told Lykins on a number of occasions that he (Thomas) would deliver the title to him (Lykins). Waknin Exhibit 22, p. 52, ln. 18-21.

The Court finds Lykins has established a claim under § 523(a)(2)(A) as follows.  First, Spotlight made a false representation to Lykins by representing it would deliver title to the Vehicle in exchange for Lykins' payment in full, in cash.  Further, Spotlight failed to inform Lykins the Vehicle was subject to the Consignment Agreement and Public Service Credit Union lien.  Second, Spotlight made the representations and omissions with the intent to deceive Lykins, as evidenced by Spotlight's history of not providing title to its customers and Teta's continuing false statements regarding the delay in producing the title.  Third, Lykins relied on the representations and omissions, as demonstrated by his paying for the Vehicle in full, in cash.  Fourth, Lykins' reliance was justifiable because Spotlight and Teta made representations typical of a car dealership and regarding the sale of a vehicle.  Further, such reliance on obtaining title is consistent with Colorado law, including COLO. REV. STAT. § 42-6-112.  Finally, Spotlight's representations caused Lykins to sustain a loss, as shown by the fact he still has not obtained title to the Vehicle and has incurred storage and insurance costs for a Vehicle he is unable to drive legally.

The Court finds Lykins has established damages for the failure to obtain title on his Vehicle, including the costs of insured secured storage.  However, allowing Lykins to retain the Vehicle and recover the price he paid for the vehicle ($21,382.42), plus allowing Waknin to recover the amount necessary to pay off the lien ($17,631.56), potentially leads to a double recovery.  This issue will be discussed below.  The Court cannot award Lykins the amount requested for automobile repairs, $1,623.45, as the evidence before the Court shows the Vehicle was purchased "as is" and there were no allegations Spotlight, Teta or Thomas misrepresented the condition of the Vehicle.  The Court will address Lykins' request for treble damages, interest, and attorney fees below.

## C.    Have Watkins and Lykins Established Claims under § 523(a)(4)?

In their Complaint, Plaintiffs further allege the debts are nondischargeable under § 523(a)(4), "because the debts arose from fraud or defalcation while acting in a fiduciary capacity, embezzlement and/or larceny."[57]

### 1.    Fraud or Defalcation While Acting in a Fiduciary Capacity

The elements to establish a debt is nondischargeable under the "fraud or defalcation while acting in a fiduciary capacity" exception have been set forth by the Honorable A. Bruce Campbell of this District:

A creditor seeking to except a debt from discharge under 11 U.S.C. § 523(a)(4) must establish two elements.  They are: (1) That a fiduciary relationship existed between the debtor and the creditor, and (2) that the debt owed to the creditor is attributable

---

[57]  Complaint, ¶ 97.  Pursuant to § 523(a)(4), "(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

to the fraud or defalcation committed by the debtor in the course of the fiduciary relationship. *In re Storie*, 216 B.R. 283, 286 (10th Cir. BAP 1997); *In re Woods*, 284 B.R. 282, 288 (D. Colo. 2001).

Determining whether a fiduciary relationship existed between the debtor and the creditor is a question of federal law, but state law is relevant. *In re Young*, 91 F.3d 1367, 1371 (10th Cir. 1996). In order to show a fiduciary relationship under § 523(a)(4), there must be an express or technical trust. *Id.*[58]

In support of their argument that a fiduciary relationship existed, the Plaintiffs argued Teta was acting as their agent in the Vehicle transactions. The Plaintiffs also pointed to the Consignment Agreement as a basis for the trust and/or fiduciary relationship, including the following exchange which took place in Thomas's deposition:

Q:     Right, I consign a car to you for sale. When you sell my car, who does that
        money belong to, in your opinion?
A:     The consigned car?
Q:     Yeah.
A:     It's the customer's money. We're an agent acting for the - - Chris wrote that
        contract, I think. We didn't do a whole lot of consignment.[59]

The Court finds the mere existence of the commercial transactions that took place between Waknin and Spotlight and Lykins and Spotlight is insufficient to establish a fiduciary relationship under § 523(a)(4). Further, based on the Court's own research, the Consignment Agreement (which would only be applicable to Plaintiff Waknin) is likewise insufficient to establish a trust or fiduciary relationship required under § 523(a)(4).

In *Howell*, the Bankruptcy Court for the Western District of Tennessee summarized the general rule regarding consignment agreements and § 523(a)(4), under similar facts:

Courts generally require that in order for a fiduciary relationship to exist when there is a consignment, the consignment proceeds must be segregated and must not be available for the consignees general use. *In re Sutton* at 394; *see also In re Hurlbert v. Drake*, 5 B.R. 149 (Bankr. D. Idaho 1980); *DL & B Oil Company v. Dawson*, 16 B.R. 343 (Bankr. N.D. Ill. 1982). In this case, there was no evidence that the

_____

[58] *In re Barnes*, 377 B.R. 289, 296-297 (Bankr. D. Colo. 2007). *See also In re Burton*, 2010 WL 3422584, *5 (Table) (10th Cir. B.A.P. 2010) (unpublished decision) where the plaintiff alleged that a technical trust relationship existed between the plaintiff and the debtor based on the debtor's status as the managing member of their joint venture. The Bankruptcy Appellate Panel affirmed the Bankruptcy Court's finding that such relationship was insufficient to establish a fiduciary relationship under § 523(a)(4). The Bankruptcy Appellate Panel went on to state Section 523(a)(4) "does not usually apply to ordinary commercial relationships." *Burton*, 2010 WL 3422584 at *5.

[59] Waknin Exhibit 22, p. 29, ln. 2-9. Questions by Mr. Ronneberg (attorney for Waknin), Answers by Mr. Thomas (as representative of Spotlight).

proceeds of the sale of the watch were segregated, and there was no evidence presented that the parties even intended that the proceeds were to be segregated. Therefore only a debtor-creditor relationship existed, as opposed to a trust relationship. *See In re Farrell & Howard Auctioneers, Inc.*, 172 B.R. 712 (Bankr. D. Mass. 1994). Although it is undisputed that Mr. Smallwood never actually received payment for the watch, and although a court, as a matter of equity, could find that an implied trust existed, the fact remains that the parties' consignment relationship did not rise to the level of an express trust as required by § 523(a)(4). Because the court finds that no fiduciary relationship existed it is unnecessary for this court to determine whether fraud or defalcation occurred.[60]

As in the *Howell* case, the Consignment Agreement in this case is a bare-bones, one-page, handwritten document, lacking any terms to create a trust. Thus, Plaintiffs' contention the debts are nondischargeable under the "fraud or defalcation while acting in a fiduciary capacity" exception fails and must be denied.

   2.   *Embezzlement or Larceny*

"Section 523(a)(4) does not require the existence of a fiduciary relationship in order to establish that a debt created by acts of embezzlement or larceny is nondischargeable in bankruptcy."[61]  The difference between embezzlement and larceny has been explained as follows:

Embezzlement has been defined under § 523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose

---

[60] *In re Howell*, 178 B.R. 730, 733 (Bankr. W.D. Tenn. 1995). *See also In re Beetler*, 368 B.R. 720 (Bankr. C.D. Ill. 2007) (finding no fiduciary relationship based on consignment or constructive trust argument); *In re Mask*, 2007 WL 7138339, *3 (Bankr. N.D. Ga. 2007) (finding no trust based on consignment agreement and stating, "Moreover, for a fiduciary relationship to be established in the context of a consignment agreement, the proceeds of the consignment sales must be segregated and must not be available for the general use of the consignee."); *In re Rigsby*, 18 B.R. 518 (Bankr. Va. 1982) (finding consignment insufficient to establish an express technical trust); *In re Perryman*, 191 B.R. 196, 199 (E.D. Okl. 1996) (same); and *Matter of Hyers*, 70 B.R. 764, 771 (Bankr. M.D. Fla. 1987) (finding no fiduciary relationship based on consignment agreement). *But see In re Sutton*, 39 B.R. 390 (Bankr. Tenn. 1984) where the Court stated in a footnote:

   An example of a consignment relationship which created a fiduciary relationship under § 523(a)(4) can be found in the case of *Volunteer State Oil Co. v. Adkisson*, 26 B.R. 879 (Bkrtcy. E.D. Tenn. 1983). In *Adkisson*, the court found that a fiduciary relationship existed where the consignee pursuant to an express agreement was required to (i) make daily deposits of proceeds from the sales of consignor's petroleum products to the account of the consignors in a bank designated by consignor, (ii) deliver deposit slips to the consignor to evidence each deposit and (iii) to make a daily report to the consignor accounting for all proceeds from petroleum sales during the preceding 24 hours.

[61] *In re Rigsby*, 18 B.R. 518, 520 (Bankr. Va. 1982). *See also In re Lynch*, 315 B.R. 173, 175 (Bankr. D. Colo. 2004) ("A claim for nondischargeability under Section 523(a)(4) may rest on proof of larceny or embezzlement, without requiring proof of a fiduciary relationship.").

hands it has lawfully come." *In re Spector*, 133 B.R. 733, 741 (Bkrtcy. E.D. Pa. 1991); *see also In re Crosswhite*, 91 B.R. 156, 159 (Bkrtcy. M.D. Fla. 1988). The Debtor paid other suppliers from the proceeds of jewelry consigned by Plaintiff. This amounts to an appropriation of property, which, as discussed above, was fraudulent. If the Debtor had obtained the property lawfully, then her acts constitute embezzlement; if she obtained it with fraudulent intent, larceny. *See Spector*, 133 B.R. at 741 (larceny differs from embezzlement only in the fact that the felonious intent existed at the time of the taking). In either case, the debt falls within the § 523(a)(4) exception.[62]

Under this definition, the Court finds Spotlight and Teta embezzled the Vehicle (or its proceeds) from Waknin and embezzled the certified funds from Lykins.[63] Specifically, Spotlight obtained the Vehicle from Waknin lawfully, but then embezzled the Vehicle (or the proceeds) by fraudulently converting such property to Spotlight's own use without Waknin's consent. Similarly, Spotlight obtained the cashier's check from Lykins lawfully, but then embezzled such funds by fraudulently converting such property to Spotlight's own use without delivering title to Lykins, and without Lykins' consent. Such debts are therefore excepted from Teta's discharge under § 523(a)(4).

As under the § 523(a)(2) claim, the Court finds Waknin has established damages for the funds withheld from the sale of the Vehicle (*i.e.* the amount of the dishonored check and payoff of the lien at Public Service Credit Union), plus insurance and debt servicing after the sale of the Vehicle. Such debt is excepted from Teta's discharge pursuant to § 523(a)(4). The Court finds Lykins has also established damages under § 523(a)(4). However, the same double recovery issues identified above remain and will be addressed below.

---

[62] *In re Nathan*, 1993 WL 300054, *5 (Bankr. S.D. Fla. 1993). *See also In re Lynch*, 315 B.R. at 179 ("The courts define embezzlement and larceny as having the same elements, with the one distinction that, with larceny, the original taking and possession of property was unlawful rather than authorized."). *See also In re Markley*, --- B.R. ----, 2011 WL 536571 (Bankr. D. Kan. February 10, 201) ("Embezzlement requires allegations of misappropriation of property of another by a person in whom said property was lawfully entrusted for a specific purpose. Larceny is misappropriation of property of another by theft.").

[63] *See In re Tague*, 137 B.R. 495, 500 (Bankr. D. Colo. 1991) wherein the Bankruptcy Court for the District of Colorado (thee Honorable Patricia A. Clark) addressed theft and fraud in the context of §§ 523(a)(2) and (a)(4):

Under Colorado case law, conversion is held sufficient for purposes of theft prosecution. *See Hucal v. People*, 176 Colo. 529, 534, 493 P.2d 23 (1971). *See also McGuire v. People*, 83 Colo. 154, 262 P. 1015 (1928) (failure to pay over money collected for another is conversion). Where theft is premised on deception under Section 18-4-401, C.R.S., the requisite mental state, an intent to defraud, must be established by proof that intentional misrepresentations were made to the victim which caused him to part with something of value in reliance on those misrepresentations. *See People v. Norman*, 703 P.2d 1261 (Colo.1985); *People v. Warner*, 801 P.2d 1187 (Colo.1990). Similar standards apply to the pleading and proof of actual fraud under Section 523(a)(2) and (a)(4). *See In re Mullet, supra; In re Black, supra.*

**D.    Have Watkins and Lykins Established Claims under § 523(a)(6)?**

In their Complaint, Plaintiffs allege the debts are nondischargeable under § 523(a)(6), "because the debts arose from willful and malicious injury by the Defendant Teta to the property of Plaintiffs."[64]   The Tenth Circuit Bankruptcy Appellate Panel has stated the following regarding
§ 523(a)(6):

> Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  To state a claim for relief under § 523(a)(6), the creditor must include allegations that would support a reasonable inference that the debtor caused a deliberate or intentional injury to the creditor.  Debts resulting from recklessness or negligence do not fall within § 523(a)(6).
> . . .
>
> [A]s the Supreme Court made clear in *Kawaauhau v. Geiger*, an intent to cause injury is required to bring a debt within § 523(a)(6).  Since a person can convert property without intending to injure the interests others may have in the property, a creditor must include allegations suggesting the debtor committed the conversion with the intent to injure to adequately state a claim for relief under § 523(a)(6).[65]

In *Tague*, the Bankruptcy Court for the District of Colorado has stated the following regarding theft and § 523(a)(6):

> The basic elements of "theft" under Colorado statute parallel the standards applied in the Tenth Circuit to determine whether an injury is willful and malicious under Section 523(a)(6).  [COLO. REV. STAT. § 18-4-401] minimally requires knowing and volitional misappropriation of another person's valuable property, coupled with an intent to deprive the other person of its use or benefit, regardless of whether such taking is merely unauthorized or accomplished by threat or deception.  *See People v. Archuleta*, 180 Colo. 156, 503 P.2d 346 (1972).  The criteria for willful and malicious injury under Section 523(a)(6) are similar in substance.  "Willfulness" requires only that a debtor intentionally perform the basic act complained, *i.e.*, that it be a deliberate and volitional act.  *See In re Posta*, 866 F.2d 364, 367 (10th Cir.1989); *In re Anzman*, 73 B.R. at 167-8.  "Maliciousness" requires a showing of either: (1) a specific intent to injure; or, (2) some deliberate conduct with actual knowledge or the foreseeability that injury will necessarily result from that conduct.  *In re Posta, supra*; *In re Compos, supra*.  Taking another's valuable property

---

[64] Complaint, ¶ 99.

[65] *In re Burton*, Slip Copy, 2010 WL 3422584, *6 (10th Cir. BAP, August 31, 2010) (unpublished decision) (citations omitted).

Page 18 of  26

knowingly and volitionally, intending to deprive them of its use and benefit, clearly falls within the scope of this standard. *In re Branch, supra.*

Although Teta did not testify at trial, his partner Thomas did. Thomas testified he and Spotlight had every intention of paying off Waknin's lien and providing title to Lykins, but the funds were not there. Thomas insisted Lykins' funds were placed into the Spotlight bank account and were used to pay business expenses. Thomas further stated he and Spotlight have cooperated with Chuck Haberstadt and the Colorado Motor Vehicle Dealer Board and Auto Industry Division to resolve disputes with Spotlight's customers and have attempted to obtain titles for each purchaser. While the Court did not find Thomas to be an untruthful witness, his testimony conflicted with all the other evidence (exhibits and witnesses) before the Court. Further, the Court accepts Thomas's testimony for what it is - Thomas's testimony (not Teta's).

Based on the number of false statements made by Spotlight and Teta, the length of time that has passed without the lien being paid off, the number of insufficient funds checks during the relevant time period, and all the facts and circumstances in this case, the Court finds Teta acted deliberately, with actual knowledge or the foreseeability that Waknin's lien would not be paid off and Lykins would not receive title to the Vehicle. Therefore, the Court finds in favor of Waknin and Lykins on their willful and malicious injury claim under § 523(a)(6). The same issues identified above regarding damage amounts are applicable to the § 523(a)(6) claim and are further discussed below.

**E.      Have Watkins and Lykins Established Entitlement to Treble Damages?**

Waknin and Lykins request treble damages, as well as attorney fees and costs, under the Colorado Consumer Protection Act, COLO. REV. STAT. § 6-1-113(2)(a)(III), and/or Colorado's criminal code regarding theft and rights in stolen property, COLO. REV. STAT. § 18-4-405.

COLO. REV. STAT. § 6-1-113 provides for damages under the Colorado Consumer Protection Act as follows:

(1) The provisions of this article shall be available in a civil action for any claim against any person who has engaged in or caused another to engage in any deceptive trade practice listed in this article. An action under this section shall be available to any person who:

(a) Is an actual or potential consumer of the defendant's goods, services, or property and is injured as a result of such deceptive trade practice, or is a residential subscriber, as defined in section 6-1-903(9), who receives unlawful telephone solicitation, as defined in section 6-1-903(10); or

. . .

(2) Except in a class action or a case brought for a violation of section 6-1-709, any person who, in a private civil action, is found to have engaged in or caused another

to engage in any deceptive trade practice listed in this article shall be liable in an amount equal to the sum of:

> (a) The greater of:
> > (I) The amount of actual damages sustained; or
> > (II) Five hundred dollars; or
> > (III) Three times the amount of actual damages sustained, if it is established by clear and convincing evidence that such person engaged in bad faith conduct; plus

> (b) In the case of any successful action to enforce said liability, the costs of the action together with reasonable attorney fees as determined by the court.[66]

The Court believes COLO. REV. STAT. § 6-1-113 applies to both Waknin and Lykins as Waknin was a consumer of Spotlight's services (the Consignment Agreement) and Lykins was a consumer of Spotlight's goods (the Vehicle).

COLO. REV. STAT. § 6-1-105 lists approximately forty-four "deceptive trade practices," including knowingly making false representations regarding goods, services, or property[67] and the failure "to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."[68]  Such deceptive trade practices would include the false representations and omissions cited above to support this Court's findings under § 523(a)(2)(A). The Court believes the clear and convincing evidence supports a finding Spotlight and Teta engaged in bad faith conduct.  Therefore, Plaintiffs are entitled to treble damages under COLO. REV. STAT. § 6-1-113(2)(a)(III).

COLO. REV. STAT. § 18-4-405 provides for damages under Colorado's criminal code, specifically for theft:

> All property obtained by theft, robbery, or burglary shall be restored to the owner, and no sale, whether in good faith on the part of the purchaser or not, shall divest the owner of his right to such property.  The owner may maintain an action not only against the taker thereof but also against any person in whose possession he finds the property.  In any such action, the owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is greater, and may also recover costs of the action and reasonable attorney fees; but monetary

---

[66] COLO. REV. STAT. § 6-1-113.

[67] COLO. REV. STAT. § 6-1-105(1)(b), (c), and (e).

[68] COLO. REV. STAT. § 6-1-105(1)(u).

damages and attorney fees shall not be recoverable from a good-faith purchaser or good-faith holder of the property.[69]

Plaintiffs' Complaint contains claims for relief for "Conversion/Civil Theft" and "Civil Conspiracy as to Civil Theft."  This Court must determine if its finding of embezzlement under § 523(a)(4) and/or willful and malicious injury under § 523(a)(6) are sufficient to invoke the treble damages section of COLO. REV. STAT. § 18-4-405.  Although the case of *In re Krupka* addresses an issue not before this Court, in that case the Chief Judge Howard R. Tallman of this Court found the definition of theft to be very broad in Colorado, as evidenced by the language in COLO. REV. STAT. 18-4-403.[70]  "As a consequence, the category of crimes to which the treble damages provisions of COLO. REV. STAT. § 18-4-405 applies is equally broad."[71]

Courts within this Circuit have differed on what is required to make a finding of theft and impose treble damages under COLO. REV. STAT. § 18-4-405.  This Court is most familiar with the issue in connection with Colorado's Trust Fund Statute.  The U.S. District Court Judge Robin J. Cauthron held once a violation of Colorado's Trust Fund Statute is established, that finding also establishes the contractor committed theft with intent.[72]  On that point, Judge Cauthron stated:

> The jury's verdict establishes [defendant] violated subsections (1) and (2) of § 38-22-127. Thus, the verdict establishes that [defendant] committed theft with intent. See [COLO. REV. STAT.] § 18-4-401(1)(a): "(1) A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and: (a) Intends to deprive the other person permanently the use or benefit of the thing of value...." Once these acts are established, the [plaintiff] is entitled to the benefits of [COLO. REV. STAT.] § 18-4-405, which includes treble damages. To the extent the court in *Barnes* held that an additional showing of criminal conduct is required, the Court finds no statutory support for this holding. Even were a finding of criminal conduct, required,

---

[69] COLO. REV. STAT. § 18-4-405.

[70] *In re Krupka*, 317 B.R. 432, 437 (Bankr. D. Colo. 2004).  COLO. REV. STAT. § 18-4-403 provides: "If any law of this state refers to or mentions larceny, stealing, embezzlement (except embezzlement of public moneys), false pretenses, confidence games, or shoplifting, that law shall be interpreted as if the word "theft" were substituted therefor; and in the enactment of sections 18-4-401 to 18-4-403 it is the intent of the general assembly to define one crime of theft and to incorporate therein such crimes, thereby removing distinctions and technicalities which previously existed in the pleading and proof of such crimes."

[71] *In re Krupka*, 317 B.R. at 438.

[72] *Parker Excavating, Inc. v. Parker*, Slip Copy, 2010 WL 1258034, at *2 (D. Colo. March 24, 2010). Judge Robin J. Cauthron of the U.S. District Court for the Western District of Oklahoma issued the opinion in this District of Colorado case.

§ 18-4-401 clearly imposes criminal intent on a person violating the statute. As noted above, [defendant's] violation was established by the jury's verdict on § 38-22-127.

The only question remaining then is whether the trebling is discretionary with the Court. Although the statute uses the word "may," that word is in reference to the ability of the owner to recover damages, not as a grant of discretion to the Court on whether or not to award treble damages. *See In re Krupka*, 317 B.R. 432 (Bankr. D. Co. 2004). Clearly, trebling is required upon satisfaction of the statutory elements of the trust fund statutes.[73]

Similarly, in *McCarty v. Powell* (*In re Powell*), U.S. District Court Judge Walker D. Miller held while an award of treble damages is not discretionary, the plaintiff must still prove the intent element of theft and that there was a violation of the Trust Fund Statute:

[T]he treble damages award under the TFS must be based on the definition of theft as contained in the theft statute, COLO. REV. STAT. § 18-4-401, which requires a showing of intent. Such a limitation on the imposition of treble damages ensures that only those who act intentionally are subjected to the harsh punishment of treble damages.[74] [75]

Recognizing the split in district court opinions, this Court will err on the side of requiring more proof than less. Intent is established in this case by the number of false statements made by Spotlight and Teta, the length of time that has passed without the lien being paid off, the number of insufficient funds checks during the relevant time period, and the existence of other customers who did not receive titles from Spotlight. Based on these findings, specifically in connection with §§ 523(a)(4) and 523(a)(6), the Court finds Waknin and Lykins have shown Spotlight and Teta possessed the requisite intent permanently to deprive Waknin of the funds and Lykins of title. Therefore, Waknin and Lykins are entitled to three times the amount of their actual damages pursuant to COLO. REV. STAT. § 18-4-405.

---

[73] *Parker Excavating, Inc. v. Parker*, 2010 WL 1258034, at *2 -3.

[74] *McCarty v. Powell (In re Powell)*, 2008 WL 4489179, at *4 (D. Colo. 2008).

[75] In *In re Barnes*, Judge A. Bruce Campbell of this Court required even further evidence: "[a] conviction for the crime of theft resulting from the violation of the Trust Fund Statute requires proof of all of the elements of criminal theft, as set forth in [COLO. REV. STAT.] § 18-4-401." *In re Barnes,* 377 B.R. 289, 301 (Bankr. D. Colo. 2007).

**F.      Have Watkins and Lykins Established Entitlement to Attorney Fees, Costs and Interest?**

Waknin seeks attorney fees and costs as of December 21, 2010, of $19,760.00.[76]  Lykins seeks attorney fees and costs as of December 21, 2010, of $14,943.14.[77]  Pursuant to COLO. REV. STAT. § 18-4-405, Waknin and Lykins may recover costs of the action and reasonable attorney fees.  The attorney fees and costs set forth by Lykins and Waknin in the affidavits may be updated by the filing of attorney fee affidavits or bill of costs as set forth below.

Plaintiffs also seek interest on their damages for at least 480 days at 8%.[78]  Plaintiffs are entitled to interest on their claims at the contract rate of interest (which is 0% in this case as no rate was agreed to) up to the date of judgment, and they are entitled to interest from the date of judgment until paid at the rate set forth in 28 U.S.C. § 1961.[79]

**CONCLUSION**

**A.      Waknin's Damages.**

In Waknin's affidavit attached to the Second Motion for Default, Waknin requests the Court award her the following damages:

| | | |
|---|---|---|
| (i) | Funds withheld from sale of automobile/dishonored check | $17,631.56 |
| (ii) | Insurance, debt servicing (interest only) on automobile | $ 1,805.30 |
| | Sub Total | $19,436.86 |

Plus the following pursuant to COLO. REV. STAT. §§ 6-1-113(2)(III) and/or 18-4-405

| | | |
|---|---|---|
| (iii) | Treble damages ($19,436.86 x 3) | $58,310.58 |
| (iv) | Interest ($19,436.86 x 480 days at 8%) | $ 2,044.86 |
| (v) | Attorney Fees and Costs up to December 21, 2010 | $19,760.00 |
| | Total | $80,115.44 |

The Court finds Waknin has established entitlement to all of the requested damages, except the prejudgment interest.  Therefore, Waknin is allowed $19,436.86 in damages, trebled to $58,310.58, plus attorney fees and costs of $19,760, for a total of $78,070.58, plus post-judgment interest at the rate set forth in 28 U.S.C. § 1961.  Waknin may update her request for

---

[76]  See Second Motion for Default, Waknin Affidavit.

[77]  See Second Motion for Default, Lykins Affidavit.

[78]  See Second Motion for Default, Waknin Affidavit and Lykins Affidavit.

[79]  28 U.S.C. § 1961 provides, in part: "Interest shall be allowed on any money judgment in a civil case recovered in a district court."

attorney fees and costs through the date of this Order by filing an attorney fee affidavit and bill of costs within fourteen (14) days of this Order.  Such debt is non-dischargeable in Teta's bankruptcy case pursuant to §§ 523(a)(2)(A), (a)(4) and (a)(6).

**B.     Lykins' Damages.**

In Lykins' affidavit attached to the Second Motion for Default, Lykins requests the Court award him the following damages:

| | | |
|---|---|---|
| (i) | Certified funds paid for purchase of automobile | $21,382.42 |
| (ii) | Automobile repairs | $ 1,623.45 |
| (iii) | Insured Secured Storage 480 days times $10.00 per day | $ 4,800.00 |
| | Sub Total | $27,805.87 |

Plus the following pursuant to COLO. REV. STAT. §§ 6-1-113(2)(III) and/or 18-4-405

| | | |
|---|---|---|
| (iv) | Treble damages ($27,805.87 x 3) | $83,417.61 |
| (v) | Interest ($21,382.42 x 480 days at 8%) | $ 2,966.40 |
| (vi) | Attorney Fees and Costs up to December 21, 2010 | $14,943.14 |
| | Total | $101,327.15 |

The Court finds Lykins' request for the full amount he paid for the Vehicle, $21,382.42, (plus retention of the Vehicle) would give him the improper "double recovery" of both his damages and ownership of the Vehicle.  Additionally, as stated above, the Court cannot award Lykins the amount requested for automobile repairs, $1,623.45, because the Vehicle was purchased "as is" and there were no allegations Spotlight, Teta or Thomas misrepresented the condition of the Vehicle.  Therefore, the Court finds the appropriate damages to be awarded to Lykins include the $17,631.56 required to pay off Waknin's lien with Public Service Credit Union (to obtain the ultimate relief desired - clean title being issued to Lykins), plus insured secured storage costs of $4,800, for a total of $22,431.56, trebled to $67,294.68, plus attorney fees and costs of $14,943.14, for a total of $82,237.82, plus post-judgment interest at the rate set forth in 28 U.S.C. § 1961.  Lykins may update his request for attorney fees and costs through the date of this Order by filing an attorney fee affidavit and bill of costs within fourteen (14) days of this Order.  Such debt is non-dischargeable in Teta's bankruptcy case pursuant to §§ 523(a)(2)(A), (a)(4) and (a)(6).

**C.     Constructive Trust**

In order to ensure both Plaintiffs are compensated appropriately for their damages, but without subjecting Teta to double liability, the Court has determined a constructive trust is an appropriate remedy regarding the damages and judgments set forth above.  The Colorado Court of Appeals has discussed the use of a constructive trust as follows:

The mechanic's lien laws, including the Trust Fund Statute, are construed according to equitable principles.  *See Regan*, 151 P.3d at 1285.  The imposition of a

constructive trust on these funds is supported by equitable principles, and is consistent with the cases cited above, which recognize that the right given to the owner under the Trust Fund Statute is to enforce the statutory trust. *In re Specialized Installers, Inc.*, 12 B.R. at 551; *First Commercial Corp. v. First Nat'l Bancorporation*, Inc., 572 F.Supp. at 1434. A constructive trust is an extremely flexible remedy, appropriate in circumstances to prevent unjust enrichment, particularly where innocent third persons, such as the subcontractors, laborers, and material suppliers here, have an interest in the property subject to the trust. *See Yetter Well Service, Inc. v. Cimarron Oil Co.*, 841 P.2d 1068, 1070 (Colo. App. 1992).

This result is consistent with the purpose of the Trust Fund Statute-to impose a trust on funds disbursed to a contractor. Imposition of a constructive trust protects the beneficiaries of the statute identified in *Regan*; it avoids the contractor's concern of exposure to double liability; and it is consistent with the goal of avoiding unjust enrichment of the owner. *See Regan*, 151 P.3d at 1288 n. 7.[80]

As set forth above, the Court has determined the damages and judgments for both Lykins and Waknin. However, under the reasoning set forth in *Syfrett v. Pullen*, the Court finds each judgment shall contain a constructive trust requiring any amounts recovered by either Lykins or Waknin shall first be paid to Public Service Credit Union, or such transferee, assignee or collection agency currently holding the debt, to pay off the lien on the Vehicle and allow Lykins to obtain clear title to the Vehicle. Any payment of the lien shall be considered a partial payment for either judgment, regardless of whether such payment was recovered from Teta by Waknin or Lykins. To be clear, under such judgments to be issued, Lykins and Waknin each become a constructive trustee of any funds collected from Teta, and must hold the funds for the benefit and purpose of paying off the Public Service Credit Union lien. Once the lien is paid off in full, including any related charges, fees or interest, each party is entitled to recover and retain any remaining portion of his or her respective judgment. Accordingly,

IT IS ORDERED the *Joint Motion for Default Judgment Pursuant to FED. R. BANKR. P. 7055-1-(b)* filed on December 28, 2010 (Docket #9) is GRANTED, in part, as to Plaintiff Waknin. Judgment shall enter in favor of Waknin and against Teta in the amount of $19,436.86 in damages, trebled to $58,310.58, plus attorney fees and costs of $19,760, for a total of $78,070.58, plus post-judgment interest at the rate set forth in 28 U.S.C. § 1961. Waknin may update her attorney fees and costs through the date of this Order by filing an attorney fee affidavit and bill of costs within fourteen (14) days of this Order. Such debt is non-dischargeable in Teta's bankruptcy case pursuant to §§ 523(a)(2)(A), (a)(4) and (a)(6).

IT IS FURTHER ORDERED the *Joint Motion for Default Judgment Pursuant to FED. R. BANKR. P. 7055-1-(b)* filed on December 28, 2010 (Docket #9) is GRANTED, in part, as to Plaintiff Lykins. Judgment shall enter in favor of Lykins and against Teta in the amount of

---

[80] *Syfrett v. Pullen*, 209 P.3d 1167, 1172 (Colo. App. 2008).

Page 25 of 26

$22,431.56 in damages, trebled to $67,294.68, plus attorney fees and costs of $14,943.14, for a total of $82,237.82, plus post-judgment interest at the rate set forth in 28 U.S.C. § 1961. Lykins may update his attorney fees and costs through the date of this Order by filing an attorney fee affidavit and bill of costs within fourteen (14) days of this Order. Such debt is non-dischargeable in Teta's bankruptcy case pursuant to §§ 523(a)(2)(A), (a)(4) and (a)(6).

IT IS FURTHER ORDERED both judgments shall be subject to a constructive trust as set forth above.

Dated: June 16, 2011

BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge